IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. H-04-0145-02 |
| | § | |
| RAFAEL E. RIVAS-LOPEZ | § | (Civil Action No. H-09-3335) |
| | § | |
| | § | |

## MEMORANDUM AND ORDER

Pending before the Court is a motion filed by the defendant, Rafael E. Rivas-Lopez ("Rivas"), to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. (Docket No. 433). Rivas has filed a memorandum in support of his motion. (Docket No. 434). The government has filed a response and a motion to dismiss, arguing that Rivas is not entitled to relief. (Docket Nos. 457, 458). Rivas has filed a reply. (Docket No. 469). The Court has carefully reviewed all pertinent matters in this criminal case. Based on this review, the Court's clear recollection of the relevant proceedings, and the application of governing legal authorities, the Court **denies** Rivas' motion and **dismisses** the corresponding civil action (H-09-3335) for the reasons set forth below.

## I.      BACKGROUND

In 2004, a federal grand jury in this district returned a multi-count indictment against Rivas and several co-defendants. *See United States v. Victoria-Magdelano, et al.*, Crim. No. H-04-0145 (S.D. Tex.). That indictment outlined a conspiracy to smuggle foreign nationals into the United States illegally, transporting and harboring or concealing them from detection, and then holding them hostage for pecuniary gain. A superseding

indictment charged a conspiracy to commit hostage taking of foreign nationals (count one); aiding and abetting the hostage taking of foreign nationals (counts two through five); aiding and abetting the harboring of illegal aliens for the purpose of commercial advantage and private financial gain (counts six through nine); and aiding and abetting the transport of illegal aliens for the purpose of commercial advantage and private financial gain (counts ten through thirteen).  (Docket No. 131).

On February 5, 2004, a jury found Rivas guilty as charged on all counts following a joint trial with four of his co-defendants, including: Victor Victoria-Magdelano, William Calderon-Lopez, Armando Gaona, and Carlos Martinez-Ordonez.  (Docket No. 194).  The evidence presented at trial, which featured testimony from a cooperating co-defendant (Zabdiel Hernandez-Bonilla) and four of the thirty-four aliens who were victimized by the smugglers (Juan Contreras-Lopez, Walter Monrroy-Euseda, Josue Antonio Vaquendano-Gutierrez, and Wilson Hernandez-Contreras), showed that Rivas was actively engaged in the smuggling conspiracy.  The extent of the conspiracy, which is summarized below, also shows that Rivas was armed with a weapon and that he threatened the aliens while holding them captive:

> The scheme consisted of smuggling illegal aliens across the Mexican border and then holding them hostage until they could secure the smuggling fee from family members. At trial, Special Agent Eleazar Perez, acting supervisor for the alien smuggling unit with the United States Bureau of Immigration and Customs Enforcement ("ICE"), testified that he received information from the Houston Police Department on March 11, 2004 that aliens were being held hostage at the GNW Audio Accessory Shop, located in Houston, Texas. SA Perez reported this information to the Immigration and Naturalization Service ("INS") office. Approximately six federal agents

and several Houston police officers were dispatched to the location. During surveillance, the agents observed Calderon leaving the shop and approaching a parked vehicle. The agents observed Gaona and a female sitting inside the vehicle. Gaona told SA Perez that he came to pick up someone to take them to lunch or breakfast.  He provided the agents with a driver's license that listed his name as "Fernando Ortiz."

SA Perez asked Calderon if he was the owner of the shop. Calderon responded that he was not. The agents and Calderon entered the shop and saw a checkbook and other documents with Calderon's name on them. When confronted with these items, Calderon admitted that he was in charge and gave written consent to search the premises.

Upon entering the shop, the agents could see an open door leading to a warehouse-type area and that people occupied the area.  A few individuals ran toward the back. A commotion then erupted and people ran everywhere. To control the situation, the agents had everyone sit down and began asking questions about their immigration status and countries of origin. Thirty-four persons were undocumented aliens recently smuggled into the United States. The agents placed them into federal custody and transported them to an INS location nearby to conduct interviews.

Special Agent Kenneth Wayne Masters provided the jury with a diagram of the shop that laid out the areas where specific pieces of evidence were discovered. For example, the agents seized a pair of handcuffs, three "pollo"[1] lists, which were described as ledgers listing the names of smuggled aliens, the dollar amounts owed, and telephone numbers for the aliens' contact person who would pay the additional smuggling fee. Special Agent Jeff Hudson testified that some of the aliens taken into federal custody were named on the pollo lists.  The agents also discovered a loaded Raven .25-APC caliber pistol and a loaded Tec-9 submachine gun, along with several rounds of ammunition.  Latent fingerprints found on the pollo lists belonged to Martinez, Rivas, and Hernandez.

---

[1] "Pollo" means chicken in Spanish. In the smuggling context, smugglers are generally known as "coyotes" and the people being smuggled are generally known as "pollos."

SA Hudson testified that approximately 34 undocumented aliens were detained at his request; that all defense lawyers were given an opportunity to interview them; that approximately sixteen aliens were detained for deposition; and that five depositions were actually taken, four of which were material witnesses for the United States and one on behalf of one of the defendants. After the depositions were taken, the aliens were processed through ICE and deported. SA Hudson attempted to secure the return of these aliens to testify at trial, but was unable to do so.

Indicted co-defendant Hernandez testified on behalf of the Government. He indicated that he and a friend illegally entered the United States toward the end of January 2004.  He was told at the border that the smuggling fee would be paid in the United States and that the fee would be $1,500, though in Houston, the fee increased to $2,000.  Upon crossing into the United States, his group met with a "walker," later identified to be Victoria.  The group walked through the brush for two days and were then transported to Houston in a car driven by an unidentified person. Hernandez was dropped off in Houston at one location and then picked up by Calderon and eventually driven to the shop.  He was at the shop for about one month and fifteen days before his arrest.  He testified that Calderon told him when they were arrested that if he kept silent, Calderon would bring him back into the United States for free.

Hernandez testified that he was "locked in" and was "a prisoner for a week or longer" during his first week in Houston.  He was told that if no one would pay for him, "they were going to give me a 'pa vajo,'" which he interpreted to mean that he would be "taken down."  He also testified that a similar threat was made to another alien and "then they took him out and I don't know what happened with him."  Because he could not get the money to pay the smuggling fee, Hernandez became involved in the conspiracy. He agreed to work for an indefinite period of time and had free roam in the shop, though he was not permitted to leave the premises.  He described his role as watching the aliens so they would not create a disturbance.  He wrote down the names of family members and telephone numbers.  He heard people making calls to family members and stating that the fee was $2,000.  He testified that the aliens were "bothered because they had collected the 1,500 and they could not get the 2,000."

Hernandez identified Rivas and Martinez as the persons who wrote down names, phone numbers, and amounts owed, and made telephone calls. He described Victoria as working with Calderon and Gaona.

According to him, Calderon and Gaona appeared to be in charge and Calderon would hand any collected money over to Gaona.   Hernandez testified that Calderon would wave his gun and make threatening gestures to the aliens and on one occasion, told the aliens, "if anybody tried to escape, he [Calderon] was going to put a bullet in their body."  He also testified that Martinez and another smuggler carried weapons.  Hernandez also carried a pistol and took turns guarding the aliens.  He received his orders from Calderon, who told him that he should threaten the aliens with the gun if they became "boisterous" or "unruly."  On one occasion, when the aliens became unruly, Calderon called Gaona, who arrived with a weapon. Hernandez testified that one illegal alien, Contreras, did not have anyone to pay the smuggling fee for him and that he:

> wanted to be sent back to the border, he wanted to be thrown back, and since he was already desperate, William [Calderon] said that he was going to have someone call a person that was called "El Toro" [Gaona] that he knew martial arts, that he knew boxing so that he could put him in his place.[2]

The four victim aliens named in the indictment testified through video deposition:  Contreras, Monrroy, Vaquedano, and Hernandez-Contreras.   Prior to playing the videotapes, the district court made a factual finding that at each deposition all "parties were present and represented by counsel."

---

[2]     Hernandez also testified about an incident involving Contreras and another alien, Monrroy, in which he witnessed Contreras pull down Monrroy's pants near the back of the shop. Hernandez perceived the incident as a sexual-type encounter and saw Monrroy hit Contreras with his fists. Hernandez related this information to Victoria and Gaona the following morning. He then saw Victoria and Gaona kick and hit Contreras. He testified that after the beating, Contreras could not eat or swallow. Contreras and Hernandez-Contreras corroborated Hernandez's testimony and testified that Victoria and Gaona beat Contreras because he could not pay the smuggling fee.  The defendants argued that Victoria and Gaona beat Contreras to protect Monrroy from a future sexual assault. However, Contreras testified that he did not attempt to sexually assault Monrroy and Monrroy testified that Contreras pulled down his pants as a joke.  Monrroy equivocated about whether Gaona and Victoria beat Contreras to protect him from a future sexual assault, but he did state that after the beating, Gaona and Victoria told Contreras, "You have that money ready by Monday, or I'm going to put you down[;]" and that "they didn't want him there anymore because he had been there too many days."

The deposition testimony of Contreras, Monrroy, Vaquedano, and Hernandez-Contreras indicates that each were part of a group that entered the United States illegally and that Victoria guided them through the brush. Contreras testified that, after entering the United States, he was locked up with approximately 70 other illegal aliens in a house close to the border. Monrroy testified that there were approximately 50 aliens at the house when he arrived. He heard Victoria given an instruction over the telephone to send a van to drive the group to Houston.  Each alien was placed into the van "some lying on top of others, some under the seat and some lying on top of the seat. And one was seated up at the front."  Victoria then drove the aliens to Houston. Vaquedano and Hernandez-Contreras were taken directly to the shop. Contreras and Monrroy were transported to a different location for a few days and then taken to the shop.  During this time at the separate location, Martinez and five other unidentified people watched over the group.

Monrroy, Vaquedano, and Hernandez-Contreras testified that upon arriving at the shop, they were told that the smuggling fee had increased. Upon arrival, Martinez instructed the aliens to "give them our telephone numbers to make the phone calls . . . so that we could get out of where they were holding us."  Both Monrroy and Vaquedano identified Hernandez, Martinez, and Rivas as the persons asking for numbers and making the calls. Hernandez-Contreras identified Rivas and Hernandez as the persons making the calls.  He gave his cousin's number to Hernandez and then heard Hernandez ask for money over the telephone.  When Contreras arrived, Martinez told him to call a relative for money.  Contreras gave Martinez his brother's number and then heard Martinez make this call: "[H]e said to send the money as soon as possible and they were giving us two days' time."

Contreras, Monrroy, Vaquedano, and Hernandez-Contreras testified that they were held captive at the shop and that the smugglers threatened to harm them if they tried to escape.  Contreras testified that Martinez and Hernandez held weapons and that Victoria and Hernandez made threats. He identified Gaona as threatening "to put us down" if they could not get the additional money, which he was told meant that "they were going to kill us."  Monrroy testified that Rivas and Hernandez received his group and that he understood that if he did not pay, he could not leave.  He further testified that Hernandez held a weapon and that Martinez, Rivas, Victoria, and Hernandez were all present when threats to kill were made.  Upon his arrest, Rivas told him "to not say anything" and "only to say that we didn't

6

have anything to say."  He indicated a reluctance to testify because Martinez had the telephone numbers of his relatives.  Vaquedano testified that Victoria, Martinez, and Gaona made threats and that Calderon, Martinez, Rivas, and Hernandez would switch using weapons.  According to him, the aliens were told to pay "so that we could get out of where they were holding us" and that if they could not get the money, "we wouldn't be let go."  Hernandez-Contreras testified that the smugglers took his shoes and shirt to prevent him from escaping and that "[w]e absolutely could not go in and out."  He identified Rivas, Martinez, and Hernandez as the persons carrying weapons and testified that Rivas and Hernandez specifically threatened to shoot anyone who tried to escape.

*United States v. Calderon-Lopez, et al.*, 268 F. App'x 279, 281-85, 2008 WL 559695 (5th Cir. 2008) (footnotes in original).

After the jury returned its guilty verdict, the Court directed the Probation Office to prepare a presentence report (a "PSR") for purposes of determining the sentence. Applying the grouping rules found in Chapter Three, Part D of the United States Sentencing Guidelines Manual, which establishes the procedure for determining the offense level where there are multiple counts of conviction, the Probation Officer who prepared the PSR assigned a base offense level score of 32 using the Guideline applicable to the most serious offense, namely, hostage taking in violation of 18 U.S.C. § 1203(a). *See* U.S. GUIDELINES MANUAL § 2A4.1 (2004).  The Probation Officer recommended a 4-level adjustment under § 3D1.4 of the Sentencing Guidelines to reflect Rivas' conviction on multiple counts, but did not include any other enhancements to the proposed sentence. (PSR ¶¶ 48-54).  Ultimately, the Court calculated a total offense level score of 36.  (Docket No. 339, at 12-13).  With one criminal history point and his placement criminal history category I, Rivas faced a range of imprisonment between 188

7

to 235 months in prison.  *See id*.  After considering the PSR and its recommended range of punishment in an advisory capacity, as well as argument by the parties and the applicable law, this Court sentenced Rivas (at the lowest end of the guideline range) to serve 188 months' imprisonment.  (Docket No. 290).[3]

On direct appeal, Rivas challenged the sufficiency of the evidence to support his conviction for hostage-taking, as alleged in counts one through five of the indictment. Rivas complained further that the district court violated his rights under the Sixth Amendment Confrontation Clause by (1) permitting the use of video deposition testimony in lieu of live testimony from several of the alien witnesses, many of whom had been deported prior to trial, and (2) by limiting cross-examination of a special agent. Rivas also challenged the reasonableness of his sentence.  The Fifth Circuit affirmed the conviction and sentence during a joint appeal.  *See United States v. Calderon-Lopez, et al.*, 268 F. App'x 279, 2008 WL 559695 (5th Cir. March 3, 2008).  Thereafter, the United States Supreme Court denied Rivas' petition for a writ of certiorari.  *See Rivas-Lopez v. United States*, ─ U.S. ─, 129 S. Ct. 134 (2008).

Rivas now seeks relief from his sentence under 28 U.S.C. § 2255.  In his motion and supporting memorandum, Rivas complains that he was denied effective assistance of counsel prior to and during his trial.  (Docket Nos. 433, 434).  The government argues

---

[3]     The Court entered a modified judgment on October 1, 2009, correcting sentence imposed for certain counts of the indictment.  (Docket No. 432).  The modification, however, did not alter the overall length of the sentence imposed.

that Rivas is not entitled to relief under 28 U.S.C. § 2255.  The parties' contentions are discussed further below under the governing standard of review.

## II.   STANDARD OF REVIEW FOR SECTION 2255 MOTIONS

To obtain collateral relief pursuant to 28 U.S.C. § 2255, a petitioner "must clear a significantly higher hurdle" than the standard that would exist on direct appeal.  *United States v. Frady*, 456 U.S. 152, 166 (1982).  When a defendant has been convicted and his conviction has been upheld on direct appeal, there is a presumption that the defendant's conviction is fair and final.  *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998).  "As a result, review of convictions under section 2255 ordinarily is limited to questions of constitutional or jurisdictional magnitude, which may not be raised for the first time on collateral review without a showing of cause and prejudice."  *Id.*  Of course, this procedural bar does not apply to claims that could not have been raised on direct appeal, such as those for ineffective assistance of counsel.  *See Massaro v. United States*, 538 U.S. 500 (2003) (holding that ineffective-assistance claims are properly raised on collateral review and not procedurally barred by a failure to raise them on direct appeal).

The defendant proceeds *pro se* in this matter.  "'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"  *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Haines v. Kerner*, 404 U.S. 519, 521 (1972); *Bledsue v. Johnson*, 188 F.3d 250, 255 (5th Cir. 1999).  Thus, *pro se* pleadings are entitled to a liberal construction that includes all reasonable inferences which can be

drawn from them.  *See Haines*, 404 U.S. at 521; *see also United States v. Pena*, 122 F.3d 3, 4 (5th Cir. 1997).  Nevertheless, *pro se* litigants are still required to provide sufficient facts in support of their claims.  *United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993).  Even under the rule of liberal construction, "mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue."  *Id.* (citing *United States v. Woods*, 870 F.2d 285, 288 n.3 (5th Cir. 1989)); *see also Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition . . . to be of probative evidentiary value.").

## III.   <u>DISCUSSION</u>

Rivas seeks relief under 28 U.S.C. § 2255 on the grounds that he was denied effective assistance of counsel prior to and during his trial.  The Constitution guarantees a fair trial for criminal defendants through the Due Process Clause, but the basic elements of a fair trial are defined largely by the Sixth Amendment, which conveys the right to have the effective assistance of counsel.  *See* U.S. CONST. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 685 (1984);  *see also McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (observing that "the right to counsel is the right to the effective assistance of counsel").  Claims for ineffective assistance of counsel are analyzed under the following two-prong standard:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.  Thus, to prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency.  *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).

The first prong of the governing standard is only satisfied where the defendant shows that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687.   Scrutiny of counsel's performance must be "highly deferential," and a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  To prove prejudice, a defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

In this instance, Rivas complains that his trial attorney was deficient for the following reasons:  (1) his counsel gave inadequate advice about whether to accept the government's plea offer; (2) he failed to interview or depose all of the aliens before they were deported; (3) he violated Rivas' right to testify; and (4) he failed to present a

definitive defensive strategy.  Rivas argues further that he is entitled to relief because he was prejudiced by the cumulative effect of his attorney's errors.  In response to these allegations, the government has provided a response and an affidavit from Rivas' trial attorney, Ali R. Fazel.  (Docket No. 458, Affidavit of Counsel).  The allegations of ineffective-assistance are reviewed below under the governing *Strickland* standard.

> ### A.    Advice During the Plea Process

Rivas reports that, at one point prior to the trial, his counsel informed him of a plea bargain offer that was proposed by the government.  (Docket No. 434, at 13).  Under the terms of the proposed plea agreement, Rivas would plead guilty to count one of the indictment, which alleged a conspiracy to commit hostage taking in violation of 18 U.S.C. § 1203(a).  (*Id.*).  According to Rivas, Fazel discussed the sentencing guidelines with him prior to trial and "estimated" a potential sentence based on the following calculations:

(1)     base offense level of <u>32</u> pursuant to U.S.C.G. § 2A4.1(a);

(2)     an additional six (6) levels pursuant to U.S.S.G. § 2A4.1(b)(1), because a ransom demand was made during the offense;

(3)     an additional two (2) levels pursuant to U.S.S.G. § 2A4.1(b)(2)(B), because a victim sustained serious bodily injury during the offense;

(4)     an additional two (2) levels pursuant to U.S.S.G. § 2A4.1(b)(3), because firearms were used during the offense; and

(5)     a three (3) level reduction pursuant to U.S.S.G. § 3E1.1, for acceptance of responsibility.

(Docket No. 434, at 13).  Thus, according to Rivas, Fazel estimated a total offense level of 39 if he were to accept the plea offer, which could have resulted in a prison sentence of between 262 and 327 months.  (Docket No. 434, at 13).

Rivas observes that the Probation Officer who prepared the PSR in his case did not include enhancements for serious bodily injury to a victim or for his use of firearms during the offense under § 2A4.1(b)(2)(B) or § 2A4.1(b)(3), as Fazel had estimated. Rivas believes that, if he had pleaded guilty, the PSR might have included only the base offense level score of 32 points without any of the other enhancements under § 2A4.1(b)(1), § 2A4.1(b)(2)(B), or § 2A4.1(b)(3) that Fazel forecasted.  Rivas speculates that, if he had agreed to plead guilty, his total offense score with a 3-level reduction for acceptance of responsibility under § 3E1.1 might have been only 29, meaning that he would have faced a sentence of between 87 and 108 months.  Rivas complains, therefore, that Fazel overestimated the potential guideline sentence, which prevented him from making "an intelligent decision" about whether to accept the guilty plea. (*Id.* at 15). Rivas now insists that, if he had known that he could have received a lower sentence of between 87 and 108 months, he would have accepted the government's plea offer and would have waived his right to a trial.

The government maintains that Rivas cannot demonstrate deficient performance for purposes of making an ineffective-assistance claim because Fazel's prediction did not grossly misrepresent the potential sentence and was sufficient to convey adequate information regarding his exposure under the guidelines.  At the outset of his affidavit,

13

Fazel refutes Rivas' claim that he wanted to plead guilty. (Docket No. 458, Affidavit of Counsel). "Quite the contrary," Fazel states, "[Rivas] was quite adamant in his desire to go to trial." (*Id.*). Fazel maintains, nevertheless, that he gave Rivas sufficient information about his potential sentence for purposes of deciding whether to accept the government's proposed plea offer or proceed to trial. Fazel explains that, even though Rivas did not want to plead guilty, he "insisted on reviewing the sentencing guidelines with [him] and also discussed the statutory maximum penalty of each statute used to charge [his client]." (*Id.*). Fazel estimated that Rivas could face a total offense score of 41 if convicted on all counts. (*Id.*). Fazel states that he is "clear in his recollection of reviewing the guideline with [Rivas] and applying the appropriate guideline information." (*Id.*). He also discussed "all plea options" with Rivas, including "assisting the Government" and the fact that such assistance does not guarantee a reduction in sentence. (*Id.*).

The Fifth Circuit has recognized that "[o]ne of the most important duties of an attorney representing a criminal defendant is advising the defendant about whether he should plead guilty." *United States v. Herrera*, 412 F.3d 577, 580 (5th Cir. 2005) (citing *Reed v. United States*, 354 F.2d 227, 229 (5th Cir. 1965)). "In determining whether or not to plead guilty, the defendant should be made aware of the relevant circumstances and likely consequences so that he can make an intelligent choice." *Teague v. Scott*, 60 F.3d 1167, 1170 (5th Cir. 1995). "When the defendant lacks a full understanding of the risks of going to trial, he is unable to make an intelligent choice of whether to accept a plea or

take his chances in court." *Id.* at 1171. Failing to properly advise the defendant of the maximum sentence that he could receive falls below the objective standard required by *Strickland*. *Id.* at 1171. In that regard, the Fifth Circuit has recognized that defense counsel is deficient where he "grossly underestimat[es]" a defendant's sentencing exposure. *United States v. Grammas*, 376 F.3d 433, 436-37 (5th Cir. 2004) (citing *United States v. Ridgeway*, 321 F.3d 512, 514 (5th Cir. 2003) (citation omitted)).

Rivas does not claim that Fazel grossly underestimated his sentencing exposure. *See Grammas*, 376 F.3d at 436-37. Nor does it show that Fazel failed to provide him with sufficient information about the potential consequences of his plea. As Rivas concedes, the government's plea agreement was "silent as to the applicable guideline provisions" and did not include a specific sentencing recommendation. (Docket No. 434, at 14). Fazel provided Rivas an estimate about the potential sentence before the Probation Office prepared the PSR and its recommended guideline range. That estimate of 39 differs from the level 36 ultimately determined by the Court and from the low offense level that Rivas believes he could have achieved. Based on the evidence of Rivas' involvement and his conduct during the offense, however, the record does not show that Fazel's estimate was unreasonable or erroneous. In that respect, courts have recognized that estimating a guideline range is not an exact science and that defense counsel is not deficient for making a prediction that turns out to be different from the sentence recommended in a PSR. *See, e.g., Knight v. United States*, 37 F.3d 769, 775

15

(1st Cir. 1994) (citing *United States v. Arvanitis*, 902 F.2d 489, 494-95 (7th Cir. 1990)) (observing that "an inaccurate prediction about sentencing will generally not alone be sufficient to sustain a claim of ineffective assistance of counsel"); *see also United States v. Moya*, 730 F. Supp. 35, 44 (N.D. Tex. 1990) (observing the same) (citing *United States v. Turner*, 881 F.2d 684, 686-88 (9th Cir.) (inaccurate prediction of guideline range does not constitute ineffective assistance of counsel); *United States v. Sweeney*, 878 F.2d 68, 70-71 (2d Cir. 1989) (because choosing a sentence under the Guidelines is not a purely mechanical task, mistaken estimate of sentence is not ineffective assistance of counsel)).

Even if Fazel's estimate was erroneous, an inaccurate estimate about potential sentence does not constitute deficient performance.  *See Daniel v. Cockrell*, 283 F.3d 697, 703 (5th Cir. 2002); *see also Beckham v. Wainwright*, 639 F.2d 262, 265 (5th Cir. [Unit B] 1981) ("[A]n erroneous estimate by counsel as to the length of sentence [is not] necessarily indicative of ineffective assistance").  Where estimating a guideline sentence is concerned, it is not enough for an attorney's prediction to be mistaken.  To be deficient, defense counsel must "substantially misstat[e]" a defendant's exposure under the guidelines.  *Grammas*, 376 F.3d at 437.  In this instance, Fazel's estimate of the potential guideline range was not grossly inaccurate and did not constitute a substantial misstatement of the applicable guideline range.[4]   Under these circumstances, Fazel

---

[4]      The Court takes judicial notice that PSRs prepared for Rivas' co-defendants convicted in this case, including Victor Victoria-Magdaleno and William Calderon-Lopez, reflected total offense scores of at least 41 levels; Armando Gaona had a total offense score of 40. One of the co-defendants, Zabdiel Hernandez-Bonilla entered a guilty plea prior to trial.

16

provided sufficient information about the potential sentence for Rivas to decide whether to accept the plea offer.  Thus, Rivas fails to demonstrate deficient performance.

In the alternative, even if Rivas could establish deficient performance, the government maintains that he does not demonstrate actual prejudice because there was no reasonable probability that Rivas would have received a lesser sentence in this instance. As Rivas acknowledges, Fazel advised him prior to the trial that he would have to plead guilty and provide assistance to the government if he wanted to reduce his potential sentence.  (Docket No. 434, Rivas' Affidavit, at ¶ 3).  Rivas concedes that he did not wish to provide assistance to the government and, therefore, he elected to proceed to trial. (*Id.* at ¶ 4).  This does not demonstrate a reasonable probability that Rivas would have accepted the proposed plea agreement and waived his right to trial.  More importantly, Rivas does not establish that he would have received a sentence of less than 188 months even if he had.

As Rivas may be aware, his co-defendant Zabdiel Hernandez-Bonilla ("Hernandez"), who pleaded guilty and testified for the government during the joint trial, received a sentence of 108 months.  To the extent that Rivas claims that he was somehow entitled to a sentence of between 87 and 108 months, Rivas gives no indication that he would have testified for the government in exchange for offering substantial assistance to the government similar to Hernandez.  In fact, Rivas has stated that he did not wish to

---

(Docket Nos. 130, 143).  This co-defendant, however, was not sentenced until after he testified for the government at trial.

provide assistance to the government.   (Docket No. 434, Rivas' Affidavit, at ¶ 4).
Likewise, the evidence, which is summarized above, shows that Rivas was actively
involved in detaining the aliens against their will and that he personally threatened them
while he was armed with a weapon.   Rivas fails to show that his sentence would not have
been subject to enhancements for his conduct or that his sentence would have been less
than the 188 months that he received.   Based on this record, Rivas does not demonstrate
that he suffered actual prejudice as a result of his counsel's advice.

Rivas does not show that counsel's performance was deficient, or that he was
actually prejudiced as a result.   Absent such a showing, Rivas fails to demonstrate that he
was denied effective assistance of counsel prior to trial in connection with the
government's proposed plea agreement.   Accordingly, Rivas does not show that he is
entitled to relief on this issue.

### B.       Failure to Properly Interview Witnesses

Rivas notes that, with respect to the hostage-taking charges referenced in counts
one through five of the indictment, the government presented "deposition testimony" at
trial from "four illegal aliens."  (Docket No. 434, at 17).   Rivas complains that Fazel
failed to properly interview these witnesses, who were deported before trial.   Rivas
appears to claim that, if Fazel had conducted an adequate interview, he would have
questioned the witnesses about their "expectations when they agreed to be smuggled into
the United States." (Docket No. 434, at 19).   Rivas believes that the witnesses would
have testified that they consented to be taken hostage and were, in fact, held in a manner

18

that was "contemplated in the alien smuggling agreement." (*Id.* at 20).  Rivas reasons, therefore, that "given deserved [sic] significance of the possibility of a consensus [sic] as to the manner of detention, counsel could have employed [sic] the testimony as a basis for acquittal." (*Id.*).

In response to Rivas' allegations, Fazel insists that he interviewed "all of the witnesses in this matter," including "the witnesses who were later deposed" prior to their deportation from the United States.  (Docket No. 458, Affidavit of Counsel).  Fazel notes that he used the information gathered during these interviews to cross-examine the government's witnesses at trial.  (*Id.*).  At one point during trial, he also used the material to confront one of the government's agents.  (*Id.*).  Rivas fails to show that his counsel failed to conduct adequate interviews of the government's witnesses.  Nor does he provide any support for his assertion that the above-referenced victims would have testified as he suggests.  Conclusory allegations of this kind are insufficient to demonstrate deficient performance or actual prejudice. *See United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007); *United States v. Holmes*, 406 F.3d 337, 361 (5th Cir. 2005); *see also Lincecum v. Collins*, 958 F.2d 1271, 1279 (5th Cir. 1992) (denying relief where the petitioner "offered nothing more than the conclusory allegations in his pleadings" to support claim that counsel was ineffective for failing to investigate and present evidence).  Accordingly, this claim does not warrant relief.

### C.      The Right to Testify

Rivas contends that he expressed a desire to testify on his own behalf, but that he backed down after his counsel pointed out that he would be subject to cross-examination. (Docket No. 434, at 21).  A criminal defendant has a fundamental constitutional right to testify on his own behalf.  *See Jordan v. Hargett*, 34 F.3d 310, 312 (5th Cir. 1994) (citation omitted).  This right is granted to the defendant personally and not to his counsel.  *See id.*  The Fifth Circuit has recognized that a defendant may waive his right to testify, and that defendants frequently do so on the advice of counsel.  *See id.*  Thus, there is no violation of the right to testify where the defendant merely acquiesced during trial to his attorney's recommendation that he not testify — even if the defendant decides later, in hindsight, that he should have testified.  *See id.*  Instead, a violation of this right occurs only if the "final decision that [the defendant] would not testify was made against his will."  *Id.* (quoting *United States v. Teague*, 908 F.2d 752, 759 (11th Cir. 1990), *rehearing granted*, 953 F.2d 1525 (11th Cir.), *cert. denied*, 506 U.S. 842 (1992)).

In his affidavit, Fazel maintains that he discussed "the pros and cons of testifying" with his client and that Rivas ultimately "agreed that it was a better decision not to testify." (Docket No. 458, Affidavit of Counsel).  To the extent that Rivas did not take the witness stand based on his counsel's advice, he cannot show that he was denied his constitutional right to testify.  *See Jordan*, 34 F.3d at 312.

Even assuming that counsel was somehow deficient for interfering with Rivas' right to testify, Rivas fails to demonstrate actual prejudice.  In that regard, other than

20

offering to "explain" his involvement, Rivas does not provide a specific account of the proposed testimony that he would have given if he had taken the witness stand. (Docket No. 434, Rivas Affidavit at ¶ 9). In light of the evidence against him, which is summarized above, Rivas fails to show how his testimony would have made a difference in the outcome of the proceedings. *See Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001) ("Considering the overwhelming evidence of [defendant's] guilt, we cannot conceive of anything [defendant] could have said that would have provided *any* reasonable possibility of a different outcome."); *see also United States v. Mullins*, 315 F.3d 449, 456-57 (5th Cir. 2002) (holding that, even where a counsel's performance was found deficient for failing to honor his client's request to testify, there was no valid ineffective-assistance claim absent a showing of actual prejudice); *United States v. Willis*, 273 F.3d 592, 598-99 (5th Cir. 2002) (same).

Rivas' unsupported allegations are not sufficient to show that his counsel's performance was deficient with regard to his right to testify or that he was actually prejudiced as a result. Absent a showing of deficient performance or actual prejudice, Rivas fails to demonstrate a valid claim of ineffective assistance of counsel on this issue. Accordingly, he fails to show that he is entitled to relief on this claim.

### D. Failure to Present a Definite Defense

Rivas argues that his attorney failed to present or pursue a definitive defensive strategy at trial. (Docket No. 434, at 22-24). Thus, Rivas takes issue with his attorney's chosen strategy or lack thereof.

Of course, strategic decisions made by counsel during the course of trial are entitled to substantial deference in the hindsight of federal habeas review. *See Strickland*, 466 U.S. at 689 (emphasizing that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight"). A federal habeas corpus court may not find ineffective assistance of counsel merely because it disagrees with counsel's chosen trial strategy. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). It is well established in this circuit that "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997); *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (citing *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1975); *Daniels v. Maggio*, 669 F.2d 1075 (5th Cir. 1982)).

In response to Rivas' complaint, Fazel maintains that he "spent an inordinate amount of time with [Rivas] explaining the facts of the case, the case law which applied, and all possible defenses." (Docket No. 458, Affidavit of Counsel). Fazel notes that he drafted and filed "all necessary motions" on Rivas' behalf. (*Id.*). The record confirms that Fazel participated in pretrial preparation, which included depositions of numerous alien witnesses. In addition, Fazel filed appropriate pretrial motions and other pleadings. A review of the transcript reflects that Fazel raised appropriate objections, engaged in thoughtful examination, and made competent arguments on his client's behalf during

22

trial. As Rivas concedes, Fazel argued that Rivas was not a part of a conspiracy to detain the smuggled aliens for ransom or to take hostages.  (Docket No. 434, at 22-23).  The record confirms that Fazel challenged the sufficiency of the evidence and the witness identifications of his client in this multi-defendant case in an effort to refute or minimize the proof of Rivas' involvement.  (Docket No. 259, *Court Reporter's Record*, Trial, vol. 6, at 706-18).  Rivas, who admits that he was part of the conspiracy to smuggle aliens for a fee, does not suggest what other defensive theory Fazel could have pursued and the record does not disclose one.

Based on this record, Rivas fails to show that Fazel failed to present a reasonable defensive strategy or that his trial was rendered unfair as a result.  Absent a showing of deficient performance or actual prejudice, Rivas fails to establish a valid ineffective-assistance claim on this ground.  It follows that Rivas fails to show that he is entitled to relief on this claim.

### E.    Cumulative Error

Rivas alleges that, as a result of the foregoing errors, Fazel's overall performance was totally deficient. Relief is only available for cumulative errors that are of a constitutional dimension. *See, e.g., Coble v. Dretke*, 496 F.3d 430, 440 (5th Cir. 2007) (citing *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993)). As previously discussed, none of Rivas' allegations establish ineffective assistance under *Strickland*.  Because he has not identified any errors of constitutional dimension, Rivas is not entitled to relief under a theory that his

conviction is tainted by cumulative error. Absent a showing that his conviction was tainted by a constitutional violation of the right to effective assistance of counsel, Rivas fails to show that he is entitled to relief under 28 U.S.C. § 2255. Accordingly, the government's motion to dismiss will be granted.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253, a certificate of appealability is required before an appeal may proceed. *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). For all of the foregoing reasons, the Court concludes that jurists of reason would not debate whether any procedural ruling in this case was correct or whether the defendant has a valid claim. Accordingly, a certificate of appealability will not issue.

## V.   CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1.      The government's motion to dismiss (Docket No. 458) is **GRANTED**.

2.     The defendant's motion to vacate, set aside, or correct sentence under 28
       U.S.C. § 2255 (Docket No. 433) is **DENIED**.

3.     The corresponding civil action (H-09-3335) is **DISMISSED WITH
       PREJUDICE**.

4.     A certificate of appealability is **DENIED**.

The Clerk shall provide a copy of this order to the parties and will file a copy with

the docket in Civil Action No. H-09-3335.

The Clerk will provide a copy of this order to the parties.

SIGNED at Houston, Texas this 30th day of April, 2010.

_____
Kenneth M. Hoyt
United States District Judge

25